IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF IDAHO

| | |
|---|---|
| SILK AMBER CELANDINE SULLIVAN, Auckland, New Zealand,<br><br>Plaintiff,<br><br>v.<br><br>JAMES WAYNE SULLIVAN, Emmett, Idaho, USA,<br><br>Defendant. | Case No. CV-09-545-S-BLW<br><br>**FINDINGS OF FACT AND CONCLUSIONS OF LAW** |

## INTRODUCTION

On October 26, 2009, Plaintiff Silk Amber Celandine Sullivan filed a Complaint in this matter petitioning the Court for the return of her minor child, C.S., pursuant to the 1980 Hague Convention on the Civil Aspects of International Child Abduction (the "Convention") and the International Child Abduction Remedies Act ("ICARA"). The Petition alleged that on December 5, 2008, C.S. was wrongfully removed from the legal custody of Ms. Sullivan by C.S.'s maternal grandmother, Caroline McGill, on the pretense that Ms. McGill was taking C.S. on an extended vacation to the United States. C.S. did not return to New Zealand as

**Findings of Fact and Conclusions of Law - 1**

planned on January 31, 2009.

Ms. Sullivan asserts that C.S. has been wrongfully retained by her Father, James Sullivan, in Emmett, Idaho. On the same date she filed her Petition, Ms. Sullivan filed a Motion for Temporary Restraining Order and Preliminary Injunction and requested an *ex parte* review of the matter.

On November 2, 2009, the Court granted Ms. Sullivan's Motion for Temporary Restraining Order, prohibiting the removal of C.S. from the State of Idaho. The Court then set the case for hearing on the preliminary injunction for November 14, 2009. However, pursuant to a stipulation of the parties, the Court entered a preliminary injunction without conducting the hearing. The matter was then set for an evidentiary hearing on December 21, 2009. The parties submitted briefs, affidavits and declarations in support of their positions, and the Court conducted the evidentiary hearing as planned. In lieu of closing arguments, the parties submitted post-hearing briefs and proposed findings of facts and conclusions of law. The Court now enters its findings of fact, conclusions of law and final order in this matter.

## FINDINGS OF FACT

1. C.S., a minor child, was born in May 2000. (Docket No. 43-1, Exhibit 101 at 9.)

**Findings of Fact and Conclusions of Law - 2**

2. Prior to the removal and retention at issue in this case, C.S. lived in New Zealand since May of 2006. (Docket No. 2-2, ¶ 4.)

3. On November 28, 2008, the Family Court of Auckland, New Zealand, issued a final parenting order granting day to day care of C.S. to Ms. Sullivan until C.S. reached the age of 16. (Docket No. 43-2, Exhibit 101-2 at 1.)

4. C.S. is now 9 years old. She was 8 years old at the time of the removal and/or retention. (Docket No. 43-1, Exhibit 101 at 9.)

5. Sometime in approximately August to November 2008, Caroline McGill, C.S.'s maternal Grandmother, discussed with Ms. Sullivan a proposed trip to the United States for Ms. McGill and C.S. It was anticipated that Ms. McGill and C.S. would visit, among other places, Disneyland and a family friend in Minnesota. (Docket No. 1 at ¶ 9; Docket No. 2-2 at 3, ¶ 6.)

6. However, an order prohibiting the removal of C.S. from New Zealand had previously been entered in a New Zealand custody proceeding. Therefore, in order for C.S. to travel outside New Zealand, Caroline McGill provided Ms. Sullivan's lawyer in the New Zealand custody proceedings a copy of the itinerary for the trip, including the dates she was expected to return to New Zealand with C.S. (Docket No. 43-2, Exhibit 101-2 at 5-8; Docket No. 11-2 at 31, 32; Docket No. 1-2 at 12-13; Docket No. 2-2 at 3, ¶ 6.)

**Findings of Fact and Conclusions of Law - 3**

7. The planned stops of the trip were confirmed in the travel itinerary and email sent to the lawyer for Ms. Sullivan, Chris Powdin. (Docket No. 43-2, Exhibit 101-2 at 5-8; Docket No. 11-2 at 31, 32; Docket No. 1-2 at 12-13; Docket No. 2-2 at 3, ¶ 6.)

8. On December 5, 2008, C.S. traveled to the United States with Ms. McGill and was scheduled to return on January 31, 2009. (Docket No. 1, Exhibit D; Docket No. 11-2 at 32.)

9. C.S. did not return to New Zealand on January 31, 2009. (Docket No. 2-2, ¶¶ 6, 7.) Instead, she remained in the United States with her Father, James Sullivan. (Id. ¶ 8.)

10. Ms. Sullivan contacted the New Zealand Ministry of Justice in early May 2009 to inquire about pursuing a Hague Application for Return of Child. (Docket No. 23 at ¶ 19.)

11. On approximately May 20, 2009, Ms. Sullivan filed a Request for Return pursuant to the Hague Convention on the Civil Aspects of International Child Abduction (Hague Convention) with the New Zealand Central Authority. (Docket Nos. 43-1 and 43-2, Exhibits 101 and 101-2.)

12. By letter dated May 29, 2009, the New Zealand Central Authority, the Ministry of Justice, transmitted Ms. Sullivan's Hague Convention Return

**Findings of Fact and Conclusions of Law - 4**

Application to the United States Department of State, Office of Children's Issues, which is the Central Authority for the Convention in the United States. (Docket No. 43-1, Exhibit 101 at 1.)

13. Ms. Sullivan filed her Hague Convention Petition for Return of Child (Docket No. 1) in this Court on October 26, 2009.

14. The parties then submitted briefs, affidavits and declarations, and an evidentiary hearing was conducted on December 21, 2009. (Docket No. 53.)

15. Ms. Sullivan appeared by videoconference from Auckland, New Zealand, and provided testimony at the hearing. (Docket No. 53.)

16. Mr. Sullivan also testified at the hearing, as did his girlfriend, Rachel Johnson. (Docket No. 53)

17. C.S. currently remains in the United States in Meridian, Idaho with Mr. Sullivan. (Docket No. 2-2, ¶ 8.)

## CONCLUSIONS OF LAW

A. **LEGAL STANDARD**

1. This Court has jurisdiction over this matter under the Hague Convention and the International Child Abduction Remedies Act ("ICARA"). ICARA grants jurisdiction to the federal district court in which the child is physically located when a petition for return of child is filed. C.S. is currently located in

Meridian, Idaho, within this judicial district. Therefore, this Court has jurisdiction to hear and decide this matter.

2. Congress enacted ICARA to implement the Hague Convention, a treaty to which both the United States and New Zealand are signatories. 42 U.S.C. § 11601(b)(1).

3. The objectives of the Hague Convention are: (1) to secure the prompt return of children wrongfully removed or retained in any Contracting State; and (2) to ensure that rights of custody and of access under the law of one Contracting State are effectively respected in other Contracting States. Hague Convention on the Civil Aspects of International Child Abduction, 1988 WL 411501, Oct. 25, 1980, art. 1 §§ a-b T.I.A.S. No. 11670.

4. The principal issue for determination in a Hague Convention proceeding is whether the child has been wrongfully removed or wrongfully retained under the terms of the Convention such that an order for the return of child should be issued forthwith. See Convention, art. 12; 42 U.S.C. § 11601(a)(4), (b)(4); id. § 11603(b), (d), (e), & (f).

5. The Convention and ICARA "empower courts in the United States to determine only rights under the Convention and not the merits of any underlying child custody claims." 42 U.S.C. § 11601(b)(4); *see also Mozes*

*v. Mozes*, 239 F.3d 1067, 1079 n.35 (9th Cir. 2001).

6. Accordingly, this Court's determination is limited to whether the petition should be granted under the applicable Convention, ICARA, and Ninth Circuit standards.

7. The Hague Convention provides that the removal or retention of a child is "wrongful" when: (1) it is in breach of rights of custody attributed to a person, an institution or any other body, either jointly or alone, under the law of the State in which the Child was habitually resident immediately before the removal or retention; and (2) at the time of removal or retention those rights were actually exercised, either jointly or alone, or would have been so exercised but for the removal or retention. Convention, art. 3; *see also Papakosmas v. Papakosmas*, 483 F.3d 617, 622 (9th Cir. 2007); *Asveta v. Petroutsas*, 580 F.3d 1000, 1004 (9th Cir. 2009).

**B. HABITUAL RESIDENCE**

8. As explained in the Findings of Fact above, on December 5, 2008, C.S.'s maternal Grandmother, Caroline McGill, traveled to the Untied States with C.S. for a two-month long vacation. Ms. McGill and C.S. were scheduled to return to New Zealand on January 31, 2009. (See Docket No. 1, Exhibit D; Docket No. 11-2 at 32.)

9. C.S. was not returned to New Zealand according to the itinerary, and as approved by Ms. Sullivan. (Docket No. 2-2, ¶¶ 6, 7.) Instead, C.S. remained and still remains in the United States, in violation of the New Zealand custody order granting day-to-day care of C.S. to Ms. Sullivan. (Id. ¶ 8.)

10. Since the failure to return C.S. from the United States to New Zealand on the scheduled return date in January 2009, Mr. Sullivan has been retaining C.S. within the United States.

11. "[T]he relevant custody rights are those recognized by the State of habitual residence, and it is the State of habitual residence to which the child should be returned and where the ultimate merits of the custody fight are to be decided." *Asvesta*, 580 F.3d at 1017.

12. Habitual residence is not defined in the Convention. Instead, courts are instructed to "interpret the expression 'habitual residence' according to 'the ordinary and natural meaning of the two words it contains[, as] a question of fact to be decided by reference to all the circumstances of any particular case.'" *Mozes*, 239 F.3d at 1071 (quoting *C v. S*, [1990] 2 All E.R. 961, 965 (Eng.H.L.)).

13. The custodial parent's intent is important to the inquiry, as "the first step toward acquiring a new habitual residence is forming a settled intention to

abandon the one left behind." *Id*. at 1075. The settled intent of the parents to move a child's habitual residence along with the passage of an "appreciable period of time" in the new place constitutes a change in habitual residence. *Id*. at 1078.

14. In this case, prior to her removal from Ms. Sullivan's custody in New Zealand, C.S. lived with Ms. Sullivan in New Zealand. Ms. Sullivan became the full-time custodial parent of C.S. in May 2006 when the two of them moved from Idaho to New Zealand. This is so notwithstanding a short period of time where Ms. Sullivan's Aunt had temporary legal custody of C.S. pursuant to an interim custody order while Ms. Sullivan underwent drug rehabilitation. ((Docket No. 2-2, ¶ 4; Docket No. 11-2, at 12-13, ¶¶ 20-24.)

15. Notably, Ms. Sullivan, Ms. Sullivan's Aunt, and Mr. Sullivan stipulated before the Family Court of New Zealand (Auckland) in August 2008 that Ms. Sullivan would have the day-to-day care of C.S. and the Aunt and James Sullivan would have rights of visitation. (Docket No. 1, Exhibit A; Docket No. 11-2, at 13.)

16. On November 28, 2008, the Family Court officially granted full-time custody and day-to-day care of C.S. to Ms. Sullivan. (Docket No. 1, Exhibit

**Findings of Fact and Conclusions of Law - 9**

B; Docket 11-2, at 27.)

17. Ultimately, C.S. lived in New Zealand for over two years prior to her removal to the United States.

18. Thus, C.S. was a habitual resident of New Zealand prior to her removal and retention. Accordingly, the custody laws of New Zealand control in this case, and the custody issue must be addressed under New Zealand law. *Mozes*, 239 F.3d at 1084.

**C. REMOVAL AND RETENTION**

19. In determining whether there has been a wrongful removal or retention within the meaning of Article 3, the Court may take notice of the law of, and of judicial or administrative decisions, formally recognized or not in the State of the habitual residence of the child, without recourse to the specific procedures for the proof of that law or for the recognition of foreign decisions which would otherwise be applicable. *Id*., 239 F.3d at 1085 n.53; See also Fed. R. Civ. P. 44.1.

20. Here, a valid custody order was in effect in New Zealand at the time of C.S.'s removal from New Zealand and subsequent retention in the United States.

21. Pursuant to the Parenting Order issued by the Family Court of New Zealand

(Auckland) on November 28, 2008, Ms. Sullivan has the right of full custody and day-to-day care of C.S. (Docket No. 1, Ex. B)

22. Therefore, C.S.'s removal from New Zealand and her subsequent retention in the United States by Mr. Sullivan are in violation of the New Zealand custody order and are a breach of Ms. Sullivan's custody rights.

**D. DEFENSES**

23. Generally, once a petitioner establishes that the removal or retention of the child was wrongful, the child must be returned unless the respondent can establish one of the narrow defenses available under the Convention.

24. Mr. Sullivan asserts the following defenses: (1) consent or acquiescence by Ms. Sullivan to the removal or retention; (2) a grave risk of that the return of C.S. would expose her to physical or psychological harm; and (3) the return of the child "would not be permitted by the fundamental principles of the requested State relating to the protection of human rights and fundamental freedoms." See Convention, arts. 13 and 20.

25. The defense of consent or acquiescence requires proof by a preponderance of the evidence standard. 42 U.S.C. § 11603(e)(2)(B). The other defenses require proof by clear and convincing evidence. Id. § 11603 (e)(2)(A). All three defenses are "narrow." 42 U.S.C. § 11601(a)(4); *see also Hazbon*

*Escaf v. Rodriquez*, 200 F. Supp. 2d 603, 614 (E.D. Va. 2002).

26. The consent defense involves the petitioner's conduct prior to the contested removal or retention, while acquiescence addresses whether the petitioner subsequently agreed to or accepted the removal or retention. *Gonzalez-Caballero v. Mena*, 251 F.3d 789, 794 (9th Cir. 2001).

27. The defense of acquiescence has been held to require "an act or statement with the requisite formality, such as testimony in a judicial proceeding; a convincing written renunciation of rights; or a consistent attitude of acquiescence over a significant period of time." *Friedrich v. Friedrich*, 78 F.3d 1060, 1070 (6th Cir. 1996) (internal footnotes omitted).

28. Consent does not require the same level of formality as acquiescence. *Baxter v. Baxter*, 423 F.3d 363, 372 (3d Cir. 2005). "The fact that a petitioner initially allows children to travel, and knows their location and how to contact them, does not necessarily constitute consent to removal or retention under the Convention." *Id.* (citing *Fabri v. Pritikin-Fabri*, 221 F. Supp. 2d 859, 871 (N.D. Ill. 2001)).

29. Here, Ms. Sullivan provided consent for C.S. to travel to the United States. However, she did not provide consent for C.S. to remain in the United States indefinitely. Ms. Sullivan's consent was limited to the vacation time with

her Grandmother. Ms. Sullivan did not consent to C.S. remaining in the United States past January 16, 2009.

30. With respect to acquiescence, although Ms. Sullivan corresponded through email with Mr. Sullivan and his girlfriend, Ms. Sullivan's statements did not amount to the formal renunciation of Ms. Sullivan's rights of custody.

31. Therefore, Mr. Sullivan's assertion of the consent and/or acquiescence defense fails.

32. The grave risk defense requires "a great deal more than minimal harm." *Gaudin v. Remis*, 415 F.3d 1028, 1035 (9th Cir. 2005) (citing Walsh v. Walsh, 221 F.3d 204, 218 (1st Cir. 2000)). Additionally, the grave risk defense should be concerned only with the degree of harm that could occur in the immediate future. *Gaudin*, 415 F.3d at 1035.

33. Here, there is no evidence that returning C.S. to New Zealand presents a grave risk of harm under the applicable legal standards. The record shows that a social worker's inquiry, home visit, and report in the New Zealand custody proceeding "suggest[ ] that there are no care and protection concerns for [C.S.] whil[st] she is in her mother' s care." (Hr. Trans. 31:13 - 22 (addressing Ex. 101 (Docket No. 43-1) at 3-24).)

34. Similarly, Pamela Putland, the New Zealand social worker, stated in an

35. e-mail that she "ha[s] no evidence of any care or protection concerns for [C.S.]." (Hr'g Tr. 31:7 - 13 (addressing Ex. 104 (Docket No. 43-5) at 1).)

35. Further, declaration testimony from an experienced New Zealand family law lawyer states that "[t]he fact of engaging in or having engaged in prostitution alone would not affect a parent's entitlement to have care of her child" under New Zealand domestic law. (Docket No. 25 ¶ 10.).

36. Therefore, Mr. Sullivan has not demonstrated "harm that could occur in the immediate future" if C.S. is returned to New Zealand and the jurisdiction of the New Zealand courts.

37. Finally, under Article 20, the return of a child may be refused "if this would not be permitted by the fundamental principles of the requested State relating to the protection of human rights and fundamental freedoms." This defense must be proven by clear and convincing evidence, and is almost never invoked. If invoked, the Article 20 defense is meant to be "restrictively interpreted and applied . . . on the rare occasion that return of a child would utterly shock the conscience of the Court or offend notions of due process." *Hazbun Escaf v. Rodriquez*, 200 F. Supp. 2d 603, 614 (E.D. Va. 2002).

38. Nothing in the record supports such a finding.

**Findings of Fact and Conclusions of Law - 14**

39. Accordingly, none of the defenses asserted by Mr. Sullivan apply here.

**E. CONCLUSION**

40. Ms. Sullivan has met her burden under ICARA.

41. Therefore, C.S. must be promptly returned to Ms. Sullivan's care in New Zealand.

## FEES AND COSTS

1. Under ICARA, 42 U.S.C. § 11607(b)(3), "[a]ny court ordering the return of a child pursuant to an action brought under section 11603 . . . shall order the respondent to pay necessary expenses incurred by or on behalf of the petitioner, including court costs, legal fees, foster home or other care during the course of proceedings in the action, and transportation costs related to the return of the child, unless the respondent establishes that such order would be clearly inappropriate.

2. Here, the Court is ordering the return of C.S. pursuant to an action brought by Ms. Sullivan.

3. Accordingly, and as more fully explained in the Court's concurrently filed Order, Ms. Sullivan will be given an opportunity to provide the Court with a final list of her incurred expenses, and Mr. Sullivan will be given an opportunity to submit a brief arguing that an order to pay such expenses is

clearly inappropriate.



DATED: **January 13, 2010**

_____
Honorable B. Lynn Winmill
Chief U. S. District Judge